UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
:
**JAMES BROWN AND LIONEL JORDAN**,               :
                   Plaintiffs,                      :
:
         – against –                               :   **MEMORANDUM DECISION AND ORDER**
:
**LONG ISLAND RAILROAD ET AL**,                       :   18-CV-6459 (AMD) (PK)
:
                  Defendants.                     :
------------------------------------------------------------- X

**ANN M. DONNELLY**, United States District Judge:

The plaintiffs brought this action against their employer, the Long Island Railroad ("LIRR"), and their supervisors Joseph Conway, Linden Webster, Richard Hoffman, Steven Modica, Andrew Morrongiello, (collectively, "the LIRR defendants"), as well as another supervisor, Andre Lugo.  The plaintiffs allege employment discrimination, hostile work environment, wrongful termination, and retaliation under 42 U.S.C. § 1983.[1]  The LIRR defendants move for summary judgment on all claims against Modica and Hoffman as well as on claims of the discriminatory assignment of overtime; they also move for partial summary judgment on the plaintiffs' conspiracy claims.[2]  Lugo moves for summary judgment on all claims.

For the reasons that follow, the Court grants summary judgment on:

- all claims against Lugo, Modica, and Hoffman in their official capacities;
- the Section 1983 conspiracy claim against all defendants;

---

[1] The plaintiffs voluntarily withdrew their claims under 42 U.S.C. §§ 1981, 1985, and 1986 against all defendants.  (ECF No. 103.)

[2] The LIRR defendants do not move for summary judgment on claims against the LIRR, Joseph Conway, Linden Webster, or Andrew Morrongiello.

- the Section 1983 retaliation, hostile work environment, and discrimination claims against Hoffman in his individual capacity; and

- the Section 1983 hostile work environment claim against Modica in his individual capacity.

    The Court denies summary judgment on:

- the Section 1983 retaliation, hostile work environment, and disparate treatment claims against Lugo in his individual capacity; and

- the Section 1983 retaliation and disparate treatment claims against Modica in his individual capacity.

## BACKGROUND[3]

James Brown and Lionel Jordan are African American men and have worked for the LIRR since October 2006, first as Electric Traction Helpers on the Third Rail and most recently as Third Rail Mechanics.  (ECF No. 91-1, LIRR Defendants' Rule 56.1 Statement ¶¶ 3–4; ECF No. 105, Plaintiffs' Rule 56.1 Counterstatement to LIRR Defendants' Statement ¶ 408.)

The Third Rail is a "live" rail with a deadly electric current.  (ECF No. 91-1 ¶ 25.) Because Third Rail employees ("Third Railmen") work "directly" with the third rail, their position is deemed "safety-sensitive."  (*Id.*)  Third Rail employees ("Third Railmen") must ensure that the Third Rail is "de-energized" before the next shift begins work, and must notify headquarters that they have de-energized the rail.  (ECF No. 105 ¶¶ 411–12; ECF No. 1 ¶¶ 24–25).  They must also report their locations—"call in" or "call out"—to a supervisor or manager at the beginning and end of every shift, so that the LIRR can keep track of any "people on the tracks."  (ECF No. 91-1 ¶ 27; ECF No. 105 at 8–9.)  Third Railman usually work from 8:00 a.m.

---

[3] Unless otherwise noted, the factual background is based on my review of the entire record, including the parties' 56.1 statements.  The Court construes the facts in the light most favorable to the plaintiff, the non-moving party.  *See Capobianco v. City of New York*, 422 F.3d 47, 50 n.1 (2d Cir. 2015).

to 4:00 p.m. in different field locations, as directed by their supervisors, but must "report back to their headquarters" at the end of each workday.  (ECF No. 91-1 ¶¶ 28–29; ECF No. 105 at 9.)

A collective bargaining agreement ("CBA") between the LIRR and the International Brotherhood of Electrical Workers ("IBEW"), Local 589, governs the terms and conditions of the plaintiffs' employment, including their overtime assignments.  (ECF No. 91-1 ¶¶ 5, 16; ECF No. 105 at 3, 6.)  Under the CBA, an IBEW representative assigns overtime shifts to Third Railmen through a "neutral rotational system."  (ECF No. 91-1 ¶¶ 16, 23; ECF No. 105 at 6–8.)  At the beginning of each calendar year, the Third Railmen receive planned overtime shifts based on seniority (ECF No. 91-1 ¶ 17; ECF No. 105 at 6), but after a few rotations through every employee, they receive assignments based on the number of overtime hours they have worked over the previous few weeks (ECF No. 91-1 ¶ 18; ECF No. 105 at 6).  A new overtime priority list comes out every Monday, reflecting the Railmen's recalculated overtime hours.  (ECF No. 91-1 ¶ 19; ECF No. 105 at 6–7.)  For unplanned overtime needs, the LIRR submits assignments to the Electric Systems Office, which reviews the current overtime list and "calls . . . the appropriate personnel."  (ECF No. 91-1 ¶ 22; ECF No. 105 at 7.)  Under the CBA, an overtime shift that is not assigned in accordance with this system "deprives another Third Railman of his or her union rights[ and] violates the CBA," and makes the LIRR "liable to the union and the injured employee."  (ECF No. 91-1 ¶ 21; ECF No. 105 at 7.)  If a Third Railman thinks he was improperly denied an overtime shift, he can file a grievance with IBEW.  (ECF No. 91-1 ¶ 24; ECF No. 105 at 8.)

## I.    July 10, 2016 Overtime Incident

On July 9, 2016, the plaintiffs worked from 8:00 p.m. until 4:00 a.m. the next morning.  (ECF No. 91-1 ¶ 113; ECF No. 105 at 28.)  The defendants say that the plaintiffs did not call out

at the end of the shift (ECF No. 91-1 ¶ 113); the plaintiffs do not dispute that, but allege that the foreman called them back to the job site after their shift ended to confirm that the third rail was de-energized, in accordance with LIRR's policy (ECF No. 105 at 28).  The plaintiffs returned to work for another eight-hour shift at 8:00 a.m. on July 10, 2016.  (ECF No. 91-1 ¶ 114; ECF No. 105 at 28.)  The defendants claim that this shift constituted unapproved overtime and violated the LIRR's CBA with the IBEW.  (ECF No. 91-1 ¶ 144.)  Defendant Richard Hoffman, the plaintiffs' supervisor, flagged the plaintiffs' time records for Defendant Andrew Morrongiello, his direct supervisor, who consulted his supervisor, Defendant Linden Webster.  (ECF No. 91-1 ¶¶ 117–19; ECF No. 105 at 29–30.)  Morrongiello told Hoffman to speak with the plaintiffs. (ECF No. 91-1 ¶ 122; ECF No. 105 at 30.)  The plaintiffs told Hoffman that "someone other than a supervisor or manager in the Electric Traction department" ordered them to work the July 10th 8:00 a.m. shift, and that the plaintiffs agreed to work the shift "without informing anyone in [the] LIRR Engineering [department]."  (ECF No. 91-1 ¶ 122; ECF No. 105 at 30.)  The plaintiffs also confirmed that they did not call out as required when they left at 4:00 a.m. on July 10 or call in when they arrived at 8:00 a.m. the same day.  (ECF No. 91-1 ¶ 123; ECF No. 105 at 30).

Morrongiello, Webster, and Defendant Joseph Conway believed that the plaintiffs' failure to call in and out was "extremely egregious;" it violated the CBA's overtime procedures and endangered the plaintiffs, which posed liability issues for the LIRR.  (ECF No. 91-1 ¶¶ 126–32; ECF No. 105.[4])  Conway and Webster recommended that the plaintiffs be disciplined, and on July 20, 2016, the LIRR brought charges against them for conduct "unbecoming of an employee" (ECF No. 91-1 ¶¶ 136, 139–40; ECF No. 105 at 35–36.)  The plaintiffs contend that the LIRR

---

[4] At points in their 56.1 statements, the plaintiffs "dispute the defendants' narrative," but do not dispute what the defendants did.  This is not sufficient to create a factual dispute about the defendants' conduct.

did not bring charges against white employees "accused of the same infraction," and that the LIRR paid white employees for "unauthorized" overtime.  (ECF No. 105 ¶ 416; *id.* at 28, 34–35.)

Jordan had a full hearing before Stephanie Nutzul, the LIRR Manager of Resource Development and Operations Support (ECF No. 91-1 ¶¶ 109–10, 146; ECF No. 105 at 27, 37), who found him guilty (ECF No. 91-1 ¶ 150; ECF No. 105 at 38).  She gave him a five-day suspension, of which he served only two days; the other three days were "held in abeyance." (ECF No. 91-1 ¶ 151; ECF No. 105 at 39.)  Brown's charges were withdrawn because of a procedural error.  (ECF No. 91-1 ¶ 144–45; ECF No. 105 ¶ 417.)

## II.   August-September 2016 Order to Separate Plaintiffs

About a week after the July 10, 2016 incident, the plaintiffs were assigned to "monitor a contractor working near the third rail."  (ECF No. 91-1 ¶ 158; ECF No. 105 at 40.)  Morrongiello saw them outside of the assigned work area, and they had not told a supervisor that they were leaving.  (ECF No. 91-1 ¶¶ 156, 158–59; ECF No. 105 at 40–41.)  According to the LIRR defendants, the plaintiffs "attempted to excuse" their absence from the site by claiming that they were delivering mail to another location (ECF No. 91-1 ¶ 157); the plaintiffs say that they and the contractors were on a break when the plaintiffs picked up work-related mail, and that they confirmed that the third rail was de-energized before they left (ECF No. 105 at 40).

Based on this and the July 10, 2016 incident, Morrongiello concluded that the plaintiffs "were unreliable and presented a safety hazard" "when they worked together without a Gang Foreman present."  (ECF No. 91-1 ¶ 160; ECF No. 105 at 41[5] (disputing only Morrongiello's "narrative" of the plaintiffs' July 2016 actions).)  Morrongiello did not have the authority under

---

[5] *See supra* note 4.

the CBA to limit the plaintiffs' overtime assignments or regulate the employees with whom they worked on overtime shifts (ECF No. 91-1 ¶ 161; ECF No. 105 at 42); however, the plaintiffs did not have the right to choose their assignments or the employees with whom they worked "during the regular business day" (ECF No. 91-1 ¶ 162; ECF No. 105 at 42 (disputing Morrongiello's motivation, not the extent of the plaintiffs' rights)).  Morrongiello conferred with the plaintiffs' union,[6] and instructed the plaintiffs' supervisors that the plaintiffs "should not be assigned to work together on non-overtime jobs where there would be no other employees present."  (ECF No. 91-1 ¶¶ 163, 165; ECF No. 105 at 42–43, ¶¶ 357–38.)

In August 2016, around the same time that Morrongiello issued the separation order, the plaintiffs transferred from Long Island City to Brooklyn.  (ECF No. 105 ¶ 420.)  On approximately August 23, 2016, the foreman of the Brooklyn Third Rail Gang, Danny Garcia, told the plaintiffs about the separation order, and that Modica had "passed on" Morrongiello's instruction to him.  (*Id.* ¶ 421.)  Later that day, Garcia met with Hoffman and Morrongiello and discussed the order.  (*Id.* ¶ 424.)  The plaintiffs maintain that Hoffman told Garcia that the plaintiffs "were going to 'jam up' [] Garcia," and that they were "trouble" and "cancers in the department."  (*Id.* (quoting ECF No. 95-11, Garcia Dep. Tr. 22:13-15).)  The plaintiffs also maintain that Morrongiello told Garcia that if he allowed the plaintiffs to work together, Morrongiello would "bring [Garcia] up on charges as well."  (*Id.* ¶ 425; Garcia Dep. Tr. 22:16-21.)  The LIRR defendants deny this statement.  According to the plaintiffs, Garcia told the

---

[6] The LIRR defendants maintain that the union "concurred with Morrongiello and consented to implementing the separation" (ECF No. 91-1 ¶ 166); the plaintiffs argue that the record does not support this fact (ECF No. 105 at 43).  The defendants say that Morrongiello did not "confer" with any other LIRR employees when he decided to separate the plaintiffs (ECF No. 91-1 ¶ 163); the plaintiffs state that Morrongiello consulted Webster and another LIRR employee (ECF No. 105 at 43).

plaintiffs what Hoffman and Morrongiello said.  (ECF No. 105 ¶ 422.)  The plaintiffs asked to transfer back to Long Island City; the LIRR agreed.  (ECF No. 1 ¶ 45; ECF No. 105 ¶ 422.)

The plaintiffs say that Morrongiello "targeted" them when he issued his directive, because he had never prohibited employees from working together, nor has he done so since. (ECF No. 91-1 at 42.)  Two defendants—Lugo and Modica—testified at their depositions that they had never heard of a directive like this before, as did Danny Garcia.  (*Id.*; *see* Garcia Dep. Tr. 18:12–19:8; ECF No. 95-3, Lugo Dep. Tr. 31:13-18; ECF No. 95-15, Modica Dep. Tr. 92:9-21, 94:11-19).)  The parties do not dispute that two-person, non-overtime jobs "make up a small minority" of a Third Railman's work.  (ECF No. 105 at 43–44.)  However, the plaintiffs disagree with the LIRR defendants' assertion that the separation order "had no impact on [the plaintiffs'] overtime opportunities or their compensation."  (ECF No. 105 ¶ 168.)

Brown reported the separation order and Morrongiello and Hoffman's comments to the LIRR's Office of Diversity Management ("ODM") in a September 13, 2016 email (ECF No. 91-1 ¶ 172; ECF No. 105 ¶ 426), and he and Jordan scheduled September 15, 2016 appointments with the ODM (ECF No. 91-1 ¶ 173; ECF No. 105 ¶ 427).  The ODM Assistant Manager told Modica that the plaintiffs had appointments (ECF No. 91-1 ¶ 175; ECF No. 105 ¶ 428); Modica told Lugo to ensure that the plaintiffs were given time off to attend.  (ECF No. 91-1 ¶ 177; ECF No. 105 at 46.)[7]

## III.   September 15, 2016 AWOL Incident

On September 15, 2016, the plaintiffs went to Jamaica, Queens for the ODM meeting, (*id.* ¶ 177; ECF No. 105 at 46), but both appointments were adjourned to September 19, 2016 so

---

[7] Modica also told Morrongiello and Webster about the appointments.  (ECF No. 91-1 ¶ 176; ECF No. 105 at 45.)

that a union representative could attend (ECF No. 91-1 ¶¶ 180–81; ECF No. 105 at 46–47).  That same morning, the ODM representative advised Modica that the plaintiffs had rescheduled their appointments, information that Modica passed on to Morrongiello and Webster.  (ECF No. 91-1 ¶¶ 187–88; ECF No. 105 at 48.)  Morrongiello told Modica to find out if the plaintiffs had returned to headquarters after the appointments were canceled.  (ECF No. 91-1 ¶ 191; ECF No. 105 at 49.)  The LIRR defendants maintain that Lugo told Modica that the plaintiffs said they would return to headquarters "after they had lunch" (ECF No. 91-1 ¶ 190), but the plaintiffs state that Lugo told them to "get lunch, stay in the area, [and] keep [their] phones on" in case he needed them (ECF No. 105 at 50, ¶ 430; *see also* Lugo Dep. Tr. 54:15-18).

As of 3:30 p.m., the plaintiffs had not returned to headquarters (ECF No. 91-1 ¶ 193; ECF No. 105 at 50).  They say that they stayed in the Long Island City service area, "waiting to hear back" from Lugo.  (ECF No. 105 ¶ 431.)  At 3:31 p.m., Lugo sent the following text to Brown: "Where the Fuck are you two!! . . . Get your ass here as fast as you can!!"  (ECF No. 91-1 ¶ 194; ECF No. 105 at 50 (citing Lugo Dep. Tr. 54:13-14.)[8]  Brown responded, "I'm near the water . . . what's up."  (ECF No. 92-2.)  Lugo sent two texts to Brown at 3:32 p.m.: "Get your ass here as fast as you can !!" and "Ass."  (*Id.*)  Brown responded, "K."  (*Id.*)

At some point before the plaintiffs came back to headquarters, Modica told Lugo to do a "headcount;" the parties dispute whether Lugo told Modica that the plaintiffs were not back before or after this instruction and whether Lugo told him that the plaintiffs were "unreachable." (ECF No. 91-1 ¶¶ 193, 196; ECF No. 105 at 50.)  Jordan returned to headquarters a few minutes before the shift ended at 4:00 p.m.  (ECF No. 91-1 ¶ 197; ECF No. 105 at 50–51.)  According to the plaintiffs, Brown returned to headquarters later that afternoon, after Lugo left at 3:55 p.m.

---

[8] Lugo did not text Jordan.  Lugo Dep. Tr. 54:9-12.

(ECF No. 105 at 51); according to the LIRR defendants, Brown did not come back at all that day (ECF No. 91-1 ¶ 197).  Modica told Morrongiello that the plaintiffs had not returned all day and were unreachable, which Morrongiello reported to Webster and Conway.  (ECF No. 91-1 ¶¶ 199, 202; ECF No. 105 at 51, 52.)  Modica submitted a report on the incident, as well as Lugo's written statement.  (ECF No. 91-1 ¶¶ 203–05, 208; ECF No. 105 at 53.)  Based on those submissions, Webster and Conway recommended disciplinary charges against the plaintiffs for being "absent without leave ('AWOL')" from 3:20 p.m. to 4:00 p.m. on September 15, 2016.  (ECF No. 91-1 ¶¶ 211–12, 213–14, 216, 221; ECF No. 105 at 55–58.)  On July 6, 2017, LIRR employee Nutzel found Brown guilty of the AWOL charge and gave him a ten-day suspension.  (ECF No. 91-1 ¶ 227–28; ECF No. 105 at 60.)  On June 20, 2017, Nutzel found Jordan not guilty of the AWOL charge.  (ECF No. 91-1 ¶ 235; ECF No. 105 at 62.)

The LIRR defendants contend that the plaintiffs' race and their reports to ODM played no role in their decision to report the plaintiffs' absence from on September 15, 2016, or to file the AWOL charge against the plaintiffs.  (ECF No. 91-1 ¶¶ 201, 206, 210, 215, 218.)  The plaintiffs, on the other hand, argue that non-Black employees were not "subject to this type of headcount;" the plaintiffs cite Lugo's deposition testimony that he "had never been asked to do a headcount as foreman" before September 15, 2016, and that he "thought a disciplinary charge for a headcount was a joke."  (ECF No. 105 at 51–52 (citing Lupo Dep. Tr. 56, 89).)

## IV.   September 15, 2016 and October 4, 2016 Texts

The plaintiffs met with ODM on September 19, 2016 "to discuss [their] allegations of discrimination and retaliation," including the "profane and disrespectful text" that Lugo sent them on September 15, 2016.  (ECF No. 91-1 ¶¶ 247–49; ECF No. 105 at 65.)  Lugo met with

ODM on October 4, 2016.  (ECF No. 91-1 ¶ 250; ECF No. 105 at 65.)  After he left the meeting,

Lugo texted "about seven" other LIRR foremen (ECF No. 92-16 at 149:19-21):

> Fellas, a couple of weeks ago brown [sic] and Jordon [sic] were not around for a head
> count.  I texted brown asking brown where was he.  He answered around the block.  I
> said "get the fuck back to hq[.]"  He never showed up and they both got caught.  So now I
> got turned in to equal opportunity and diversity for cussing at brown through a text.
> These are the two guys that y'all bro hug and shit!!

(ECF No. 92-15; ECF No. 105 ¶ 402.)  Lugo testified that he sent the text because he was

"frustrated" and "venting to the guys because [he] just felt stabbed in the back by [the

plaintiffs]."  (ECF No. 92-16 at 150:2-9.)

In an October 27, 2016 email to ODM, Brown alleged that Lugo sent the October 4th text

"in retaliation" for the plaintiffs' complaint about his September 15, 2016 text.  (ECF No. 91-1

¶ 254; ECF No. 105 at 66.)  When Lugo learned that the plaintiffs reported the text to ODM,

Lugo "stated in reference to [the plaintiffs], 'You wanna . . . play rough?  We can play rough.'"

(ECF No. 95-13 at 6.)  The ODM investigated the plaintiffs' allegations (ECF No. 91-1 ¶¶ 255–

56; ECF No. 105 at 66–67) and found "probable cause to believe" that Lugo "subjected [the

plaintiffs] to retaliation" by texting the other foremen and by making the "we can play rough"

comment.  (ECF No. 95-13 at 6; ECF No. 91-1 ¶ 257; ECF No. 105 at 67).  The LIRR brought

disciplinary charges against Lugo for his conduct (ECF No. 91-1 ¶ 261; ECF No. 105 at 68); a

"letter of instruction" was put in his file and he was ordered to take a "mandatory full-day

diversity training" (ECF No. 91-1 ¶ 262; ECF No. 105 at 68).

## V.     November 3, 2016 Docking of Pay

The parties dispute nearly all facts related to Brown's alleged "chronic[] late[ness]."

(ECF No. 91-1 ¶ 264 (citing ECF No. 91-27, Declaration of Andre Lugo[9] ("Lugo Decl.") ¶ 39);

---

[9] The plaintiffs object to the LIRR defendants' reliance upon unsworn declarations to support their motion
for summary judgment.  (ECF No. 95-24 at 15.)  The Court may consider the defendants' declarations

ECF No. 105 at 68.)  The LIRR defendants contend that Brown was "late to work[] far more than any other Third Railman under Lugo's supervision" (*id.* (citing Lugo Decl. ¶ 39)), and that other Third Railmen complained to Lugo that Brown was "continually late with no repercussions, while they all had to come in on time" (*id.* ¶ 265 (citing Lugo Decl. ¶ 39)).  According to the defendants, Lugo spoke to Brown about his lateness; when the situation did not improve, Lugo reported Brown to Modica and Hoffman, which he was "obligat[ed] to do" as a Gang Foreman. (*Id.* ¶¶ 266–67 (citing Lugo Decl. ¶ 40; ECF No. 91-33, Declaration of Stephen Modica ("Modica Decl.") ¶ 28).)  Modica told Webster about Lugo's report, and Webster told Modica "to document Brown's incidents of lateness" and "dock Brown's pay for the most recent such incident."  (*Id.* ¶¶ 269–71 (citing Modica Decl. ¶¶ 28–29; ECF No. 91-25, Declaration of Linden Webster ("Webster Decl.") ¶¶ 41–42).)  On November 3, 2016, Modica told Lugo to "note Brown's most recent lateness for a pay dock."  (*Id.* ¶ 273 (citing Lugo Decl. ¶ 41).)  The LIRR defendants maintain that Brown's race and ODM complaints about management "played no role" in his pay being docked.  (*Id.* ¶ 268 (citing Lugo Decl. ¶ 40), ¶ 272 (citing Webster Decl. ¶ 43), ¶ 274 (citing Lugo Decl. ¶ 41), ¶ 277 (citing Modica Decl. ¶ 30).)  Rather, it was Brown's lateness "on scores of occasions" that prompted the action.  (*Id.* ¶ 273 (citing Lugo Decl. ¶ 41).)

The plaintiffs maintain that Brown was not "chronically late" and that the defendants do not cite "anything in the record demonstrating" his lateness.  (*See, e.g.*, ECF No. 105 at 68.)

---

pursuant to 28 U.S.C. § 1746.  *LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 65–66 (2d Cir. 1999) (holding that a district court may consider "an unsworn letter in ruling on a summary judgment where it "substantially complies" with Section 1746's requirements; *see Batista v. United States*, 792 F. App'x 134, 135 (2d Cir. 2020) (finding Section 1746 declarations "not defective" even though they did not "contain the precise phrase 'true and correct'" as the statute requires).

The plaintiffs also argue that the declarations rely on facts that "contradict or conflict with . . . deposition testimony . . . or rel[y] on impermissible hearsay" (ECF No. 95-24 at 15), though they do not identify the offending statements.  The Court has considered the entire record to reach its conclusions and has taken any discrepancies into account.

According to the plaintiffs, Lugo did not regularly dock employees' pay and had not done so since "2014 or 2015." (*Id.* at 70 (citing Lugo Dep. Tr. 173:13–174:7).)  The plaintiffs say that Lugo docked Brown's pay "[i]n discriminatory retaliation" on his own (*id.*), and that he allowed all non-Black employees to go home before their shifts were over; he did not "deem [them] AWOL," and submitted timesheets reflecting, incorrectly, that those employees were present for the whole shift. (*Id.* at 69 (citing Lugo Dep. Tr. 76:8-14).)

## VI.    January 2017 Facebook Posts

In approximately January 2017, the plaintiffs submitted a complaint to ODM about three of Lugo's Facebook posts. (ECF No. 105 ¶ 450; Brown Dep. Tr. 96:22–4, 98:9-15.)  One called Black Lives Matter a "hate group" and compared the movement to the Ku Klux Klan. *See* ECF No. 95-19 at 3.)  In another post, Lugo attached a meme showing Leonardo DiCaprio raising a glass of wine with the caption, "How you feel when your boss tells you a coworker filed a complaint about your 'attitude;'" Lugo wrote, "Lmaoo[.]  Hits home right here !!" (*Id.* at 1.) The third was a doctored photograph of President Obama, and a Medal of Freedom recipient, with four mug shots of African Americans; one of the mugshots was superimposed over the face of the actual recipient. (*Id.* at 2.)  Lugo wrote "Obomma's [sic] America" over the image. (*Id.*) ODM did not investigate this complaint. (Brown Dep. Tr. 98:12-17.)

## VII.   May 12, 2017 Parking Lot Incident

At the end of the workday on May 12, 2017, Brown was parked in an LIRR lot, "block[ing] Lugo's car from exiting the parking lot." (ECF No. 91-1 ¶¶ 279–80; ECF No. 105 at 72–73.)  Lugo honked at Brown.  When Brown did not move, Lugo got out of his car and cursed

and yelled at Brown to move. [10]  (ECF No. 91-1 ¶ 281; ECF No. 105 at 73.)  The defendants say that Brown's race and ODM complaints against Lugo "had nothing . . . to do" with the altercation.  (ECF No. 91-1 ¶ 283.)  The plaintiffs respond that Lugo's actions were "in retaliation" for their ODM complaints.[11]  (ECF No. 105 ¶ 282.)  LIRR investigated, and concluded that "both employees had acted unprofessionally."  (ECF No. 91-1 ¶ 287; ECF No. 105 at 74.)  The LIRR did not bring disciplinary charges against Brown or Lugo.  (ECF No. 91-1 ¶ 291; ECF No. 105 at 76.)

## VIII.   Harm to the Plaintiffs

A counselor at LIRR's EAP office recommended that the plaintiffs get treatment "to aid with the effects of discrimination," which include "anxiety; frustration; bouts of depression; loss of interest in activities; and sleeplessness."  (ECF No. 105 ¶ 452.)  Beginning in September 2016, the plaintiffs "sought and continue to receive counseling" because of "the discrimination and hostile work environment" to which the LIRR defendants "subjected" them.  (*Id.* ¶ 451.) The plaintiffs have "suffered humiliation and embarrassment" because of the defendants' "unequal treatment."  (*Id.*)  The plaintiffs were ineligible for promotion for three years after they were disciplined (ECF No. 91-1 ¶¶ 15, 294–95; ECF No. 105 at 6, 76), and say that they "have lost pay as a result of the wrongful discipline" and because the defendants conspired "to fabricate a reason to pass [them] over for promotion" to Gang Foremen (ECF No. 105 ¶ 452).  When the plaintiffs became eligible for promotion, however, the position was posted three times, and neither plaintiff applied for the positions.  (ECF No. 91-1 ¶¶ 298–99; ECF No. 105 at 77.)  Nor did the plaintiffs file any overtime grievances.  (ECF No. 91-1 ¶ 300; ECF No. 105 at 77.)

---

[10] The other defendants did not see the dispute between Brown and Lugo.  (ECF No. 91-1 ¶¶ 284–85; ECF No. 105 at 73–74.)

[11] The plaintiffs do not cite to anything in the record to support this statement.  (ECF No. 105 at 73.)

## LEGAL STANDARD

Summary judgment is appropriate only if the parties' submissions, including deposition transcripts, affidavits, or other documentation, show that there is "no genuine dispute as to any material fact," and the movant is "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  The movant has the "burden of showing the absence of any genuine dispute as to a material fact."  *McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d Cir. 1997); *see Tsesarskaya v. City of New York*, 843 F. Supp. 2d 446, 453–54 (S.D.N.Y. 2012) ("While disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment[,] [f]actual disputes that are irrelevant or unnecessary will not be counted." (quoting *Anderson*, 477 U.S. at 248)).  "Once the moving party has met this burden, the party opposing summary judgment must identify specific facts and affirmative evidence that contradict those offered by the moving party to demonstrate that there is a genuine issue for trial."  *Ethelberth v. Choice Sec. Co.*, 91 F. Supp. 3d 339, 349 (E.D.N.Y. 2015) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  The non-moving party "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful."  *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998).  In deciding whether summary judgment is appropriate, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party.  *See Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010); *Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 226 (2d Cir. 2008).  Because the defendants are moving for summary judgment, I draw all reasonable inferences in the plaintiff's favor.

The Second Circuit has "repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where, as here, the merits turn on a dispute as to the employer's intent," as intent can be easily obscured. *Banks v. GM, LLC*, No. 21-2640, 2023 U.S. App. LEXIS 23757, at *20 (2d Cir. Sept. 7, 2023) (quoting *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008)). "Due to the 'elusive nature of intentional discrimination,' plaintiffs must often 'rely on bits and pieces of information to support an inference of discrimination.'" *Id.* (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86 (2d Cir. 2015)). Thus, "[b]ecause of the likelihood that 'direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'" *Id.* (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997)). "The resulting 'mosaic of intentional discrimination' may be sufficient to show discrimination." *Id.* (quoting *Vega*, 801 F.3d at 86). "Nonetheless, even in the discrimination context, a plaintiff must still present more than conclusory allegations to survive a motion for summary judgment." *Id.* (citing *Chertkova v. Conn. Gen. Life Ins.*, 92 F.3d 81, 92 (2d Cir. 1996)).

## DISCUSSION[12]

### I.  Claims Against Lugo, Modica, and Hoffman in Their Official Capacities

The plaintiffs sue Lugo, Modica, and Hoffman in their official and individual capacities. Lugo argues that he is entitled to summary judgment on the claims against him in his official

---

[12] The plaintiffs voluntarily withdrew their Section 1981 claims against all defendants (ECF No. 103) because Section 1981 "does not provide a separate right of action against state actors." *Tanner v. MTA Long Island R.R.*, No. 22-CV-9831, 2023 WL 319526, at *4 (S.D.N.Y. Jan. 17, 2023). However, Section 1983 "constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units." *Duplan v. City of New York*, 888 F.3d 612, 619 (2d Cir. 2018) (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733 (1989)). The plaintiffs have not withdrawn their Section 1983 for retaliation, hostile work environment, and disparate treatment. (ECF No. 103.)

capacity because they "are legally equivalent to claims against the LIRR" and are in any event "legally meritless because Plaintiffs cannot meet their burden to prove that Lugo committed acts pursuant to a discriminatory policy or custom at LIRR."  (ECF No. 92 at 3.)  The LIRR defendants argue that "all claims" against Modica and Hoffman must be dismissed.  (ECF No. 91-48 at 2.)

A suit against an individual in his official capacity is "to be treated as a suit against the entity [of which an officer is an agent]."  *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).  The suit is, in effect, not "against the individual personally, for the real party in interest is the entity." *Id.*  When a plaintiff "names both the municipal entity and an official in his or her official capacity," courts in the Second Circuit "have consistently dismissed the official capacity claims as redundant."  *Phillips v. Cnty. of Orange*, 894 F. Supp. 2d 345, 384 n.35 (S.D.N.Y. 2012) (collecting cases).  *See also Graham*, 473 U.S. at 165–66, 167 n.14 (finding that "[t]here is no longer a need to bring official-capacity actions against local government officials, for under *Monell*, local government units can be sued directly" (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)));  *Field Day, LLC v. Cnty. of Suffolk*, 799 F. Supp. 2d 205, 214 (E.D.N.Y. 2011) (dismissing official capacity claim because the real party in interest was the County, which was a named party to the action);  *Gazzola v. Cnty. of Nassau*, No. 16-cv-909, 2016 U.S. Dist. LEXIS 142566, at *12–13 (E.D.N.Y. Oct. 13, 2016) (collecting cases).

Therefore, to the extent the plaintiffs seek to hold Lugo, Modica, and Hoffman liable for conduct also attributed to the LIRR, the claims against them in their official capacities are redundant, and dismissal is appropriate.

## II.     Conspiracy Claims

The plaintiffs bring conspiracy claims under 42 U.S.C. § 1983 against all the defendants in both their official and individual capacities, alleging that the defendants conspired to "discriminate, retaliate, and create a hostile environment against [the plaintiffs] and cause [the plaintiffs'] employments to be wrongfully diminished" or neglected to prevent such misconduct. ECF No. 1 ¶¶ 108–09; *see id.* ¶¶ 92–118.

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999).  The LIRR defendants and Lugo argue that the intracorporate conspiracy doctrine precludes the plaintiffs from establishing the first element, because the employees of a single corporation or, in this case, a municipal entity, are "legally incapable of conspiring" together.  (ECF No. 92 at 13; *see also* ECF No. 91-48 at 10–12).

Under the intracorporate conspiracy doctrine,[13] "officers, agents, and employees of a single corporate entity are legally incapable of conspiring together."  *Hartline v. Gallo*, 546 F.3d 95, 99 n.3 (2d Cir. 2008).  The doctrine does not apply, however, when the "individuals within [the] single entity," working within the scope of their employment, "are pursuing personal interests wholly separate and apart from the entity."  *Dowd v. DeMarco*, 314 F. Supp. 3d 576, 588 (S.D.N.Y. 2018); *see also Little v. City of New York*, 487 F. Supp. 2d 426, 442 (S.D.N.Y.

---

[13] The Second Circuit "has recognized the intracorporate conspiracy doctrine in the context of [42 U.S.C.] § 1985," *Ali v. Connick*, 136 F. Supp. 3d 270, 282 (E.D.N.Y. 2012), but "has yet to decide whether the [] doctrine applies to conspiracy claims under section 1983," *Guillen v. City of New York*, 625 F. Supp. 3d 139, 160 (S.D.N.Y. 2022) (citing *Zilioli v. City of New York*, No. 17-CV-9495, 2020 U.S. Dist. LEXIS 57704, at *4 (S.D.N.Y. Apr. 1, 2020)).  Nonetheless, "district courts have typically applied the logic of the [doctrine] to § 1983 claims."  *Id.* (collecting cases).

2007) (explaining that the "personal interest" exception to the intracorporate conspiracy doctrine applies to cases in which "the individuals are motivated by an independent personal stake in achieving the corporation's objective").   "[P]ersonal bias does not constitute personal interest and is not sufficient to defeat the intracorporate conspiracy doctrine." *Bond v. Bd. of Educ. of the City of New York*, No. 97-CV-1337, 1999 U.S. Dist. LEXIS 3164, at *7 (E.D.N.Y. Mar. 17, 1999); *see also Seidman v. Colby*, No. 18-CV-202, 2021 U.S. Dist. LEXIS 228706, at *25–26 (N.D.N.Y. Nov. 30, 2021) (finding "personal animus" does not satisfy this standard; rather, the officials must have a personal stake in a corporate objective, such as receiving some kind of workplace recognition (like "a performance bonus") or "covering up misconduct" in the workplace).

The intracorporate conspiracy doctrine also does not apply to conduct that is outside the scope of employment.   There is no "bright line test" for distinguishing between activities taken under color of law and "personal pursuits." *Pitchell v. Callan*, 13 F.3d 545, 548 (2d Cir. 1994). "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)).   This analysis goes beyond "a simple determination as to whether an officer was on or off duty when the challenged incident occurred." *Pitchell*, 13 F.3d at 548.

The LIRR defendants argue that the conduct undergirding the plaintiffs' conspiracy claim—"requesting disciplinary charges for Plaintiffs' misconduct, insuring [sic] that Plaintiffs did not work together without supervision, and docking pay for lateness"—was entirely within the scope of their employment—specifically, their "supervisory capacity" over the plaintiffs—so

the intracorporate conspiracy doctrine bars the plaintiffs' conspiracy claim as a matter of law. (ECF No. 91-48 at 11, 12.)  The LIRR defendants contend that Lugo's October 4, 2016 text and parking lot confrontation with Brown were outside the scope of Lugo's employment, but that "there is no admissible evidence that Lugo acted in agreement with any [of the LIRR] Defendant[s] in taking [those] actions." (*Id.* at 13.)  Lugo argues that the conspiracy claim is barred by the intracorporate conspiracy doctrine, and that regardless, "no evidence [establishes] that the defendants agreed to violate the [p]laintiffs' civil rights." (ECF No. 92-19 at 13.)  The plaintiffs respond that they have stated a § 1983 conspiracy claim, but do not cite any facts or case law to support that position. (ECF No. 95-24 at 16–17, 40–41.)

The intracorporate conspiracy doctrine bars the plaintiffs' claims regarding conduct within the scope of the defendants' employment.  The plaintiffs have not adduced any evidence that the defendants were motivated by any "independent personal stake in achieving the [LIRR's] objective." *Little*, 487 F. Supp. 2d at 442 (citation omitted).[14]

To the extent that some of Lugo's conduct was outside the scope of his employment, the plaintiffs do not allege or cite evidence that the LIRR defendants conspired with Lugo in any of that conduct.  Indeed, the LIRR disciplined him for the October 4 text (ECF No. 92-1 ¶¶ 46–49; ECF No. 96 at 11–12), and investigated him for the May 12, 2017 parking lot incident (ECF No. 92-1 ¶ 59; ECF No. 96 at 14), concluding that Lugo and Brown "had acted unprofessionally" (*id.*).  The plaintiffs' mere assertion that they have established a conspiracy claim is insufficient.

---

[14] In an Article 78 petition in New York Supreme Court, Lugo sought an order directing the LIRR to defend him in this action (*see* ECF No. 95-5), and argued that "the LIRR's true motivation for charging [him]" with disciplinary action for the October 4, 2016 text was its animosity toward [Lugo's] Union and its desire to cover up the wrongdoing perpetrated against the Plaintiffs by [the LIRR defendants]" (ECF No. 105 ¶ 404 (quoting ECF No. 95-5)).  That claim is not relevant to the conduct that the plaintiffs claim was discriminatory: the AWOL charges against the plaintiffs.  Moreover, personal animus without more cannot defeat the doctrine.

*Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999) ("Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment."), *cert. denied*, 530 U.S. 1242 (2000).

Therefore, the defendants are entitled to summary judgment on the § 1983 conspiracy claim.

## III.   Retaliation

Lugo argues that the plaintiffs have not stated a retaliation claim because their complaint was not "citizen speech" on a matter of public concern as required under the First Amendment. (ECF No. 92 at 10–11 (citing *Montero v. City of Yonkers, New York*, 890 F.3d 386, 395 (2d Cir. 2018) ("[A public] employee may be protected from retaliation even when speaking in the workplace when he or she is speaking "as a citizen ... upon matters of public concern.""))   But the plaintiffs' retaliation claim is based on Section 1981, not the First Amendment.

Section 1981 "outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment," and provides a cause of action against private actors for retaliatory discrimination. *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 224 (2d Cir. 2004).   As discussed above, Section 1983 allows plaintiffs to bring Section 1981 claims against state or local government units or officials.   Courts evaluate retaliation claims using the three-step burden-shifting analysis outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973).   *See Littlejohn v. City of New York,* 795 F.3d 297, 315 (2d Cir. 2015).   First, the plaintiff must establish a *prima facie* case of retaliation by a preponderance of the evidence, showing: (1) participation in a protected activity known to the defendant; (2) an adverse employment action; and (3) a causal connection between the protected activity and the adverse action.   *Lowe v. Mount Sinai Health Sys., Inc.*, No. 16-CV-6074, 2018

U.S. Dist. LEXIS 75921, at *10 (S.D.N.Y. May 4, 2018) (citing *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012)), *aff'd*, 764 F. App'x 120 (2d Cir. 2019).  "The plaintiff's burden in this regard is '*de minimis*,' and 'the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive.'"  *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)).

Once the plaintiff establishes a *prima facie* case of retaliation, "the burden of production shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action."  *Lowe*, 2018 U.S. Dist. LEXIS 75921, at *8 (citing *Jute*, 420 F.3d at 173).  If the defendant offers such proof, the burden shifts back to the plaintiff, who must then show "that the 'legitimate, non-retaliatory reason' offered by the employer is mere pretext, and that the employer's 'desire to retaliate' was the real 'but-for cause of the challenged employment action.'"  *Russell v. N.Y. Univ.*, 739 F. App'x 28, 32 (2d Cir. 2018) (quoting *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70, 73 (2d Cir. 2015)).  For the reasons discussed below, the Court denies summary judgment on the § 1983 retaliation claim against Lugo.

a.    **The Prima Facie Retaliation Claim**

The plaintiffs engaged in protected activity about which Lugo knew.  They lodged complaints with ODM—first about Morrongiello's directive prohibiting them from working together on certain assignments as well as Morrongiello and Hoffman's offensive comments, and then about Lugo's September 15, 2016 and October 4, 2016 texts and his comments about "playing rough."  *See Fouche v. St. Charles Hosp.*, 64 F. Supp. 3d 452, 458 (E.D.N.Y. 2014) (protected activity includes "protest[ing] or oppos[ing] statutorily prohibited discrimination," and "must put the employer on notice that the employee feels" that he was discriminated against).  It

is undisputed that the LIRR was aware of the plaintiffs' protected activity; the plaintiffs

complained to the LIRR employees who worked at ODM, who reported the complaints to the

plaintiffs' superiors, including Lugo.  (*See, e.g.*, ECF No. 91-1 ¶¶ 175, 261; ECF No. 105 at 68,

¶ 428.)  *See Williams v. Time Warner, Inc.*, No. 09-cv-2962, 2010 U.S. Dist. LEXIS 20916, at

*15 (S.D.N.Y. Mar. 3, 2010) (noting that the "'actual decisionmaker' responsible for the adverse

actions [must be] aware of [the] protected activity"), *aff'd*, 440 F. App'x 7 (2d Cir. 2011).

　　　In a retaliation case, an "adverse employment action" must be sufficiently "harmful"

"that it could well dissuade a reasonable worker from making or supporting a charge of

discrimination.'"  *Duplan v. City of N.Y.*, 888 F.3d 612, 626–27 (2d Cir. 2018) (quoting *Shultz v.*

*Congregation Shearith Israel*, 867 F.3d 298, 309 (2d Cir. 2017)).  "[T]rivial harms—i.e., those

petty slights or minor annoyances that often take place at work and that all employees

experience—are not" sufficiently adverse actions.  *Shultz*, 867 F.3d at 309 (quoting *Tepperwien*

*v. Entergy Nuclear Ops., Inc.*, 663 F.3d 556, 568 (2d Cir. 2011)).  It is undisputed that the

plaintiffs received AWOL disciplinary charges, were prohibited from working together on two-

person, non-overtime jobs, and suffered "humiliation and embarrassment" because of Lugo's

texts.  Brown's pay was also docked.  The disciplinary charges, which made the plaintiffs

ineligible for promotion for three years, and the docking of Brown's pay are quintessential

adverse employment actions that would make an employee think twice about reporting

discriminatory conduct.  *See id.* at 304 (quoting *Galabya v. N.Y. City Bd. of Educ.*, 202 F.3d 636,

640 (2d Cir. 2000)).

　　　Construing the evidence most favorably to the plaintiffs, there is sufficient proof that the

plaintiffs' complaints to ODM led to the adverse employment actions, which occurred very close

in time.  The LIRR defendants brought AWOL charges against the plaintiffs the same day they

met with ODM, and Lugo sent the October 4, 2016 text the same day he met with ODM about the plaintiffs' complaint.  Within weeks of the plaintiffs' ODM complaints, the defendants issued the separation order and docked Brown's pay.  A plaintiff establishes causation either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant."  *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000).  The temporal proximity between the protected activity and the adverse actions—ranging from a few hours to a few weeks—is sufficiently "close" to suffice as evidence of causality for purposes of a *prima facie* case.  *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001); *see Cunningham v. Consol. Edison, Inc.*, No. 03-cv-3522, 2006 U.S. Dist. LEXIS 22482, at *55–56 (E.D.N.Y. 2006) (collecting cases in which two months was sufficiently close in time).

### b.    Explanation for the Adverse Employment Action

Lugo argues that the AWOL charges and the pay docking were legitimate consequences for the plaintiffs' workplace misconduct—"fail[ing] to report to headquarters after taking [off] the entire day" and Brown's chronic lateness, respectively.  (ECF No. 92-1 at 12 n.4.)  Lugo maintains that the October 4, 2016 text message was an "entirely accurate" account of September 15, 2016's events, and that he was entitled to express "dissatisfaction with the bogus charge lodged against him" (based on his September 15 text) and to "stat[e] his opinion to his fellow workers."  (*Id.* at 11.)

### c.    Pretext

Once the defendant articulates a legitimate, nondiscriminatory reason for the adverse employment action, "the employee must be afforded an opportunity to prove the existence of

factual issues demonstrating that the stated reasons were merely a pretext for discrimination." *Siani v. State Univ. of N.Y.*, 7 F. Supp. 3d 304, 324 (2d Cir. 2014) (quoting *Meiri v. Dacon*, 759 F.2d 989, 997 (2d Cir. 1985)).  The plaintiff may do this "by persuading the trier of fact" either "that a discriminatory reason more likely than not motivated the employer," or "that the employer's proffered explanation is unworthy of belief.  *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1181 (2d Cir. 1992) (citations omitted).  The issue of pretext "is ordinarily for the jury to decide at trial rather than for the court to determine on a motion for summary judgment." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 79 (2d Cir. 2001).

It is undisputed that it was "not the regular practice to conduct a head count" (*see* Lugo Dep. Tr. 56, 89) and that the defendants had never before instructed a supervisor to separate two Third Railmen during non-overtime jobs (ECF No. 95-24 at 36; *see* Garcia Dep. Tr. 18:12–19:8; ECF No. 95-3, Lugo Dep. Tr. 31:13-18; ECF No. 95-15, Modica Dep. Tr. 92:9-21, 94:11-19). Moreover, the plaintiffs allege that non-Black employees were not subject to the same treatment, and that Lugo often let those employees leave early without docking their pay; indeed, according to the plaintiffs, Lugo filled out the employees' time sheets incorrectly to reflect that they worked a full shift.  (ECF No. 105 at 69 (citing Lugo Dep. Tr. 76:8-14).)

It is also undisputed that Lugo's October 4, 2016 text referred to the plaintiffs' ODM complaint against him and denigrated the plaintiffs; indeed, Morrongiello agreed he "could see how an employee hearing such comment like Lugo's being fearful of their job."  (*Id.* at 37; *see* Morrongiello Dep. Tr. 197:11–198:4.)  The LIRR also found "probable cause to believe" that Lugo's text was "retaliatory," and that the text combined with Lugo's other comments to the plaintiffs "might well deter reasonable individuals from filing complaints with [ODM] and/or cooperating with [ODM] investigations."  (*See, e.g.*, ECF No. 95-13 at 6, 11.)  Further, there are

genuine issues of fact as to whether the plaintiffs were really AWOL on September 15, 2016 (*see, e.g.*, Lugo Dep. Tr. 54:15-24),[15] and whether Brown was "chronically late" to work (*compare id.* at 68:23–69:18, *with* ECF No. 95-7, Brown Dep. Tr. 152:9-12, 153:14-16).  Finally, Lugo's Facebook posts, including the one in which he refers to the complaint, could be interpreted as evidence of discriminatory animus.  (ECF No. 95-24 at 37–38.)  A rational jury could conclude that the plaintiffs' ODM complaints were the but-for cause of the adverse actions that the defendants took against them.  Accordingly, summary judgment is denied.

### d.    Personal Involvement

There is also a genuine dispute of material fact about the extent to which Lugo was personally involved in the adverse employment actions.  To establish a 1983 claim against a government official in his individual capacity, a plaintiff must show that the official was "personally involved" in the alleged violation.  *Gazzola*, 2016 U.S. Dist. LEXIS 142566, at *13 (citation omitted); *see also Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000) ("[P]ersonal liability under section 1981 must be predicated on the actor's personal involvement.").  A plaintiff may do so by showing the defendant (1) "participated directly in the alleged . . . violation;" (2) "failed to remedy the wrong" "after being informed of the violation through a report or appeal;" (3) "created a policy or custom under which [the illegal] practices occurred, or allowed" such a policy or custom to continue; (4) "was grossly negligent in supervising subordinates who committed the wrongful acts;" or (5) "exhibited deliberate indifference to the rights of [the plaintiffs]."  *Gazzola*, 2016 U.S. Dist. LEXIS 142566, at *13–14

---

[15] At his deposition, Lugo denied telling Modica that he told the plaintiffs "to stay in the area" on September 15, 2016, rather than report to headquarters.  (Lugo Dep. Tr. 58:2-21).  Modica denied that Lugo told him that he had texted with Brown that afternoon about his whereabouts (Modica Dep. Tr. 82:19–85:21).

(quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)).  There is a genuine issue of fact about whether Lugo was personally involved in retaliating against the plaintiffs, evidenced by the parties' multiple disputes—including who initiated, ordered and implemented the September 15 AWOL charges (*see, e.g.*, Modica Dep. Tr. 82:2-10, 82:19–85:21; Lugo Dep. Tr. 56:20–57:25) and the pay docking (*compare, e.g.*, Lugo Decl. ¶ 40; Modica Decl. ¶ 28, *with* Lugo Dep. Tr. 76:8-14, 173:13–174:7)—all of which are material facts.

## IV.   Hostile Work Environment

Lugo argues that the plaintiffs have alleged only sporadic "instances of strife" that do not establish a hostile work environment, and that they have not otherwise established that Lugo's conduct was motivated by race.  The plaintiffs respond that the totality of circumstances, including Morrongiello's and Lugo's description of the work environment as "hostile," is sufficient evidence of a hostile work environment.  (ECF No. 95-24 at 36–37.)

To establish a hostile work environment claim, a plaintiff must produce evidence that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)); *see Williams v. N.Y.C. Hous. Auth.*, 61 F.4th 55, 69 (2d Cir. 2023) ("A hostile work environment is shown when 'a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted' to be deemed 'pervasive.'" (quoting *Alfano v. Costello*, 294 F.3d 365, 372 (2d Cir. 2002))).  The plaintiffs must also establish that Lugo's "*own* conduct created a sufficiently hostile work environment; *and* . . . that [Lugo's] conduct was a 'but-for' cause of the hostile work environment." *Naumovski v. Norris*, 934 F.3d 200, 222 (2d Cir. 2019).

Like the retaliation claim, the plaintiffs must establish that Lugo was personally involved in creating the hostile work environment. *Whidbee*, 223 F.3d at 75. As discussed above, there are disputed issues of material facts about the degree of Lugo's involvement in the decisions to bring AWOL charges against the plaintiffs, to keep them from working together on any job or assignment, and to dock Brown's pay. (ECF No. 95-24 at 35.) A reasonable jury could also find that Lugo's threatening comments to the plaintiffs after they complained to ODM about him were sufficiently "pervasive" to constitute a hostile work environment. ODM found that there was "probable cause" that Lugo retaliated against the plaintiffs when he sent the October 4, 2016 text, and when he said to them, "You wanna play rough? We can play rough." (*See* ECF No. 95-13 at 6, 9.) Lugo also made "'sarcastic' or otherwise insincere remarks to [coworkers] in reference to [the plaintiffs]." (*Id.* at 7.) Finally, one of his Facebook postings appeared to refer to the plaintiffs, and others included arguably racist memes. As explained above, Lugo was disciplined for his conduct. Therefore, Lugo's personal involvement in creating a hostile work environment is a genuine issue for trial, and summary judgment on this claim against Lugo is denied.

## V.  Disparate Treatment

For similar reasons, the Court denies summary judgment on the § 1983 disparate treatment claim against Lugo. As discussed above, the evidence of Lugo's personal involvement in the LIRR's disparate treatment of the plaintiffs is genuinely in dispute. The plaintiffs also allege that Lugo did not treat non-Black employees the way he treated the plaintiffs. (*See, e.g.*, ECF No. 105 ¶ 416; *id.* at 28, 34–35 (the LIRR paid non-Black employees for working unauthorized overtime shifts and did not discipline them), 51–52 (non-Black employees were not "subject to . . . headcount[s]" (citing Lupo Dep. Tr. 56, 89).) If the plaintiffs' evidence is credited

and all reasonable inferences are drawn in their favor, a reasonable jury could conclude that Lugo participated directly in discriminating against the plaintiffs.

## VI.    Personal Involvement of Modica and Hoffman

The LIRR defendants also argue that the plaintiffs have not sufficiently established that Modica and Hoffman "played any role in any adverse action taken against the [p]laintiffs" (ECF No. 91-48 at 16), or that Modica and Hoffman were personally involved in creating a hostile work environment (*id.* at 18–19). According to the LIRR defendants, "the record is undisputed that neither Modica nor Hoffman has authority to fire or otherwise discipline employees, or even to suggest that such discipline be brought" (ECF No. 91-48 at 16 (quoting ECF No. 91-1 ¶¶ 58–59, 77–78)), and that Webster, Conway, and Morrongiello—the other LIRR defendants—were responsible for the decisions to discipline the plaintiffs (*id.* at 16–18).

It is undisputed that Hoffman told Morrongiello about discrepancies on the plaintiffs' timesheets related to their shifts on July 9 and 10, 2016. (ECF No. 91-1 ¶¶ 116–17.) On Morrongiello's orders, Hoffman asked plaintiffs what happened on those days (*id.* ¶¶ 121–23), and reported their answers back to Morrongiello (*id.* ¶ 124). But Hoffman did not take part in the decision to investigate the plaintiffs (*id.* ¶¶ 119–20) or to charge them with "conduct unbecoming" of an employee (*id.* ¶¶ 126, 130–37); rather, Hoffman gathered information that other LIRR employees used to make those decisions. This is not sufficient "personal involvement" to hold Hoffman liable for the Section 1983 disparate treatment claim.

Hoffman was personally involved in enforcing the separation order by threatening that he would bring disciplinary charges against Danny Garcia if Garcia let the plaintiffs work together. However, the plaintiff does not establish that the separation order constitutes an adverse employment action sufficient to support a disparate treatment claim. *See Collymore v. City of*

28

*New York*, No. 16-CV-8270, 2016 U.S. Dist. LEXIS 100326, at *9 (S.D.N.Y. June 14, 2018) (holding that the plaintiff did not suffer adverse action where her "shift was changed to one that did not permit requesting overtime," she "was yelled at and humiliated in meetings," and "was denied overtime," among other things), *rev'd on other grounds*, 767 F. App'x 42 (2d Cir. 2019); *Sosa v. N.Y.C. Dep't of Educ.*, 368 F. Supp. 3d 489, 518 (E.D.N.Y. 2019) (finding too minor the plaintiff's allegations that she "was accused of rules violations while other teachers were permitted to breach those rules, was not given a desired preparation period, was falsely accused of workplace misconduct, among other things"), *report and recommendation adopted by* 368 F. Supp. 3d 489 (E.D.N.Y. Mar. 25, 2019).

The only allegation about Hoffman that appears to relate to the retaliation claim is that Hoffman may have told Lugo to write a statement about the September 15, 2016 incident— which helped the LIRR bring the allegedly retaliatory AWOL charges.  (ECF No. 95-24 at 21). Even if a jury decided that Hoffman did direct Lugo to write a report, that would not, without more, constitute "carry[ing] out" the discriminatory retaliation.  *Bazile v. N.Y.C. Hous. Auth.*, No. 00-CV-7215, 2002 U.S. Dist. LEXIS 1639, at *53–54 (granting summary judgment for defendants who only "approv[ed] the implementation of" the discriminatory policy, rather than "carr[ying] [it] out").  Nor is Hoffman's instruction to Lugo a sufficiently "affirmative link" between Hoffman and the decision to bring the AWOL charges.  *Whidbee*, 223 F.3d at 75.

Hoffman's remarks about the plaintiffs—calling them "trouble" and a "cancer," and that they were going to "jam up" Garcia (ECF No. 91-48 at 21–22)—while perhaps offensive, do not constitute sufficient personal involvement in creating a hostile work environment.  *See Patterson*, 375 F.3d at 227.  A reasonable jury would not conclude that Hoffman's comments, made in one closed-door meeting, contributed enough to the hostile work environment to

constitute personal involvement in "alter[ing] the conditions of the plaintiffs' employment."

*Demoret*, 451 F.3d at 149.  Therefore, the Court grants summary judgment to Hoffman on all

Section 1983 claims.

     The Court also grants Modica's motion for summary judgment on the plaintiffs' Section

1983 hostile work environment claim, but denies summary judgment on the disparate treatment

and retaliation claims.  The parties disagree about which LIRR defendant ultimately decided to

initiate the adverse employment actions against the plaintiffs, and the LIRR defendants do not

contest that Modica at least implemented or "carried out" those decisions.  This dispute creates a

triable issue of fact about whether Modica was personally involved in the disparate treatment and

retaliation.  *See Bazile*, 2002 U.S. Dist. LEXIS 1639, at *53–54 (denying summary judgment

with regard to officers who "communicated transfer decisions directly to the employees" during

the relevant time period, which required an inference that they "participat[ed]" in "carr[ying]

out" the discriminatory policy); *Jong-Fwu v. Overseas Shipholding Grp., Inc.*, No. 00-CV-9682,

2002 U.S. Dist. LEXIS 15355, at *21 (S.D.N.Y. Aug. 21, 2002) (holding that a defendant's

"recommend[ation] to his supervisor that [a plaintiff's] position be eliminated" to be "sufficient

to constitute personal involvement" relating to the plaintiffs' retaliation claim).  However, the

plaintiffs do not allege any conduct by Modica that "permeated" the workplace with

"discriminatory intimidation, ridicule, [or] insult," so the hostile work environment claim must

be dismissed.

**VII.   Overtime**

     The plaintiffs seek compensatory damages for "lost opportunities" as a result of the

alleged discrimination.  The LIRR defendants argue that the plaintiffs have not adequately

alleged that the plaintiffs were "ever improperly denied or not offered overtime other than the unauthorized July 10, 2016 shift."  (ECF No. 90 at 20.)

"To recover compensatory damages [a] plaintiff [in a Section 1983 action] must prove that his injuries were proximately caused by the constitutional violation."  *Atkins v. New York City*, 143 F.3d 100, 103 (2d Cir. 1998).  In addition, the "deprivation of the opportunity to earn overtime can be an adverse employment action" for Section 1983 purposes.  *Rivers v. N.Y.C. Hous. Auth.*, 176 F. Supp. 3d 229, 252 (E.D.N.Y. 2016) (collecting cases), *aff'd sub nom. Crenshaw v. N.Y.C. Hous. Auth.*, 697 F. App'x 726 (2d Cir. 2017).

The plaintiffs' complaint includes multiple claims for "maximum monetary damages" for "loss of employment benefits…[and] great financial expense[.]"  ECF No. 1 at 27.  Brown testified that he was "removed from the overtime list" and could not work overtime shifts if Lugo was the supervisor (ECF No. 95-24 at 27), which Lugo corroborated when he testified that he told his supervisors—including Modica—that "honestly it's a very hostile work environment and I don't feel comfortable" working with the plaintiffs.  (*Id*. at 26.)  This creates a genuine dispute of material fact as to whether the defendants were denied overtime as a result of the alleged retaliation and racial discrimination.

**CONCLUSION**

For these reasons, the Court grants the defendants' motions for summary judgment on the conspiracy claims against all defendants, and on the claims against Lugo, Modica, and Hoffman in their official capacities.  The Court denies Lugo's motion for summary judgment on the retaliation, hostile work environment and disparate treatment claims.  The LIRR defendants' motion for summary judgment on the retaliation and disparate treatment claims against Modica in his individual capacity is denied; the motion is granted on the hostile work environment claim against Modica in his individual capacity and on all Section 1983 claims against Hoffman in his individual capacity.

**SO ORDERED.**

                              _____s/Ann M. Donnelly_____
                              ANN M. DONNELLY
                              United States District Judge

Dated: Brooklyn, New York
       September 29, 2023